## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT TOMASZEWSKI,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | **NO.  17-4675** |
| **Defendant.** | : | |

**DuBois, J.**                                                                                    **May 14, 2020**

### M E M O R A N D U M

### I.      INTRODUCTION

This is an employment discrimination case arising out of the hiring of a new Commissioner of Prisons by the City of Philadelphia after the election of Mayor James Kenney in 2015.  Plaintiff, a Caucasian male who previously served as a Deputy Commissioner in the Philadelphia Department of Prisons ("PDP"), applied for the Commissioner position after the former Commissioner announced his retirement.  Plaintiff alleges that defendant, the City of Philadelphia ("the City"), considered his race and gender based in part on a discriminatory diversity initiative when it failed to promote him to Commissioner and ultimately appointed an African American woman to that position.  Plaintiff further asserts that, after complaining about the City's purportedly discriminatory conduct, he was subjected to retaliation.

Presently before the Court is a motion for partial summary judgment filed by plaintiff and a motion for summary judgment filed by the City.  For the reasons that follow, the Court denies plaintiff's motion for partial summary judgment and grants the City's motion for summary judgment.

## II.     BACKGROUND[1]

### A.     Start of the Kenney Administration and Plaintiff's Application for the Commissioner of Prisons Position

James Kenney was elected Mayor of Philadelphia on November 3, 2015; he was sworn into office on January 4, 2016.  Def.'s Stmt. Undisputed Material Fact ("Def.'s SUMF") ¶ 12. During the period after Mayor Kenney was elected but before he was officially sworn in, the Kenney Administration established the Transition Committee for Criminal Justice and Public Safety to advise the Administration on criminal justice and public safety issues and to make recommendations on personnel hiring for high-level public safety roles ("Public Safety Transition Committee" or "the Committee").  *Id.* ¶¶ 38–39.  The Committee was composed of then-Commissioner Lou Giorla and multiple community members, including Minister Rodney Muhammad, the head of the Philadelphia chapter of the NAACP; the court administrator for the First Judicial District of Pennsylvania; two criminal defense and civil rights attorneys; the dean of a local law school; and a former Philadelphia City Solicitor.  *Id.* ¶ 41.

Shortly after the election, Giorla notified the Mayor-elect that he would be retiring from the PDP.  *Id.* ¶ 35.  The Kenney Administration thereafter directed the Public Safety Transition Committee to interview and recommend candidates for the Commissioner position, from which recommendations the Administration would determine who should advance in the application process.  *Id.* ¶ 43.  Various City officials were involved in the hiring process, including Jane Slusser, Mayor Kenney's then-Chief of Staff; Brian Abernathy, then-First Deputy Managing Director, who oversaw the operations of the City's public safety-related departments, including PDP; and Michael DiBerardinis, then-Managing Director of the City.  *Id.* ¶¶ 13–17.

---

[1] The facts are presented in the light most favorable to plaintiff.  Disputed facts are noted as such.  Where appropriate, plaintiff and the City's statements of material facts are cited in lieu of a direct citation to the record.

Slusser, Abernathy, and Giorla testified that the Kenney Administration sought a candidate for Commissioner who could implement the Mayor-elect's vision for criminal justice reform.  *Id.*  ¶ 66–68.  Specifically, the City states that it was seeking someone with strong experience in social services, behavioral health, and rehabilitation.  *Id.*

Plaintiff began working for the PDP in 1984 as a correctional officer and, after serving in multiple roles, was named the Deputy Commissioner of Administration in 2005.  *Id.*  ¶¶ 25–29; Pl.'s Stmt. Material Facts Not in Dispute Resp. Def.'s Mot. Summ. J. ("Pl.'s SUMF") ¶¶ 2–10. He submitted his application for the Commissioner position in early December 2015 through the transition website established by the Kenney Administration.  Def.'s SUMF ¶ 44.

On December 9, 2015, the Public Safety Transition Committee interviewed plaintiff, Rodney Brockenbrough, William Crowley, and Michael Resnick, who at that time was the Director of Public Safety.[2]  *Id.* ¶¶ 36, 45–46; Pl.'s SUMF ¶¶ 51–52.  After the interviews, the Committee recommended that Resnick, a Caucasian male, and Brockenbrough, an African American male, should advance to the next round of interviews, but that plaintiff and Crowley should not advance.  Def.'s SUMF ¶¶ 49–50; Pl.'s SUMF ¶ 53.  A December 10, 2015 e-mail summarizing the Committee's deliberations recommended, *inter alia*, plaintiff as a "[p]otential Deputy," but "[n]ot as commissioner."  Def.'s SUMF ¶ 50; Def.'s Mot. Summ. J. ("Def.'s Mot.") Ex. 25.  In late December 2015, the Kenney Administration notified plaintiff that he was no longer under consideration for the Commissioner position.  Def.'s SUMF ¶ 62.

### B.    The City Conducts Second Round of Interviews and Blanche Carney is Recommended

Two days after plaintiff was interviewed, on December 11, 2015, Slusser and two other

---

[2] On a different date, the Public Safety Transition Committee interviewed Leon King, an African American male and former Commissioner of Prisons, but he did not advance further in the hiring process.  Def.'s SUMF ¶ 50 n.1.

Kenney Administration officials sent an update on hiring to Abernathy and DiBerardinis.  *Id.*
¶ 65; Def.'s Mot. Ex. 27.  The memo stated, *inter alia*, that there were "no clear strong
candidates" for the Commissioner position and that a national search was now in its early stages.
Def.'s Mot. Ex. 27.  As a result, in January 2016, the City appointed Resnick as Acting
Commissioner on an interim basis while the City continued its search.  Def.'s SUMF ¶ 69.
Abernathy testified that the Public Safety Transition Committee did not conduct any additional
interviews after Mayor Kenney was inaugurated on January 4, 2016.  *Id.*; Def.'s Mot. Ex. 9
("Abernathy Dep. I") 112:114–113:3.

Between early January 2016 and February 12, 2016, with the support of an outside
recruiter, Abernathy, Giorla, and another City official, Julie Wertheimer, interviewed at least two
new candidates, including Darcela Sessomes.[3]  Def.'s SUMF ¶ 73; Pl.'s SUMF ¶ 61; Def.'s Mot.
Ex. 29.  Sessomes, an African American female, was an Assistant Commissioner for the New
Jersey Department of Corrections.  Def.'s SUMF ¶ 75; Def.'s Mot. Ex. 29.  Based on these
interviews, Abernathy recommended that Mayor Kenney and DiBerardinis interview Sessomes
and Resnick as finalists for the Commissioner role.  Def.'s SUMF ¶ 79; Def.'s Mot. Ex. 30; Pl.'s
SUMF ¶ 63.

After making the recommendations, Abernathy arranged for Resnick to take Sessomes on
a tour of PDP facilities on March 7, 2016.  Def.'s SUMF ¶ 80; Pl.'s SUMF ¶ 66.  Resnick did not
approve of Sessomes's candidacy because he thought she was unqualified and unfamiliar with
the Philadelphia prison system.  Def.'s SUMF ¶¶ 81–82; Pl.'s SUMF ¶ 67.  After the tour,
Resnick shared his concerns about Sessomes with Abernathy and told him, among other things,

---

[3] The City states that Abernathy, Giorla, and Wertheimer comprised a Second Level Interview Committee.  Def.'s
SUMF ¶ 56, n.2.  Plaintiff disputes that such a committee existed and was an official part of the application process.
*See* Pl.'s Resp. Def.'s SUMF ¶ 56.

"If you want to hire a black female, we have one and her name is Blanche Carney."  Def.'s
SUMF ¶ 86; Pl.'s SUMF ¶ 75; Def. Ex. 15 ("Resnick Dep.") 86:13-18.  At the time, Carney was
the Deputy Commissioner for Restorative and Transitional Services.  Def.'s SUMF ¶ 84.  She
had worked in the Department of Prisons since 1995—first as a social worker, then as social
work supervisor and human services program administrator before being named Deputy
Commissioner in 2014.  *Id.* ¶ 108.  In response to Resnick's recommendation of Carney,
Abernathy stated, *inter alia*, "Oh, that's a great idea.  Why didn't I think of that?"  *Id.* ¶ 90.

Resnick testified that he recommended Carney, in part, because Lorenzo North, the
president of the correctional officers union, had previously told him that the City wanted to
appoint a black female to the Commissioner position.  *Id.* ¶ 87; Pl.'s SUMF ¶ 65; Resnick Dep.
49:18–50:22.  There is no evidence that North obtained this information from City officials.
Def.'s SUMF ¶ 88; Resnick Dep. 50:23–51:9, 131:8–132:21.

Based on Resnick's recommendation, Abernathy informed Slusser, the Mayor's Chief of
Staff, about Carney and her potential candidacy.  Def.'s SUMF ¶¶ 100–01.  In an e-mail dated
March 8, 2016, Abernathy wrote to Slusser:

> Had a "discussion" with Resnick after yesterday's tour.  The one issue raised
> that I didn't have a good response for was why we haven't considered
> Blanche Carney – she's a current Deputy.  African American woman.  Well
> respected in the system.  Similar experience to Darcella.  Can we discuss?

*Id.* ¶¶ 100–01; Def.'s Mot. Ex. 33; Pl.'s SUMF ¶ 82.  Abernathy thereafter contacted
Carney to determine if she would be interested in applying for the Commissioner position,
and approximately three days later, she confirmed her interest and submitted her resume.
Def.'s SUMF ¶¶ 104, 111; Pl.'s SUMF ¶¶ 85–86; Carney Dep. 42:11–43:5, 45:12–14.

In late March 2016, Carney was interviewed by Abernathy, Giorla, and
Wertheimer, after which Abernathy recommended her for Mayor Kenney's consideration.

Def.'s SUMF ¶¶ 113, 116–17; Pl.'s SUMF ¶ 87–88; Abernathy Dep. 165:24–166:1.
Ultimately, Mayor Kenney approved the selection of Carney, who soon thereafter
accepted the Commissioner position.  Def.'s SUMF ¶ 126.  On April 12, 2016, Mayor
Kenney announced the selection of Carney and stated that he was "very excited it was a
woman we finally picked."  *Id.* ¶ 127; Def.'s Mot. Ex. 37; Pl.'s SUMF ¶ 96.

Plaintiff testified that, around this time, in April 2016, Resnick told him that Minister
Muhammad—a member of the Public Safety Transition Committee—and the NAACP pressured
the Kenney Administration to appoint an African American female as Commissioner.  Def.'s
SUMF ¶¶ 58–59; Pl.'s Resp. Def.'s SUMF ¶¶ 58–59; Tomaszewski Dep. 79:24–80:22.
According to plaintiff, on an unspecified date, North told him that "the City was looking to hire a
black female for Prisons Commissioner."  *Id.* at 19:4–10.  Plaintiff also testified that he
"believe[d] [Muhammad is] the one that made the suggestion that the Commissioner of Prisons
would be a black female," although he never heard Muhammad make such a statement and never
saw documentation of such a statement.  *Id.* at 27:20–28:16.  Significantly, Muhammad denied
having ever communicated with City officials about appointing an African American female
Commissioner.  Def.'s Mot. Ex. 18 ("Muhammad Dep.") 56:8–57:1.

### C.    The City's Diversity Initiative

The City admits that it has a goal of creating a more diverse municipal workforce that
"looks like the City of Philadelphia."  Def.'s SUMF ¶ 131.  The City states that its diversity
goals are "aspirational," and that it "never instructed anybody to hire an applicant of a certain
race"—claims that plaintiff disputes.  *Id.* ¶ 133; Abernathy Dep. 57:15–21; Pl.'s Resp. Def.'s
SUMF ¶ 133.

According to the City, its diversity goals "arose out of Mayor Kenney's dissatisfaction

with the lack of diversity at the executive level in City government."  Def.'s SUMF ¶ 132; Def.'s Mot. Ex. 37 ¶ 10.  Consistent with this goal of increased diversity, DiBerardinis, the Managing Director, testified that he also "understood it as a priority" of Mayor Kenney to appoint women to leadership positions.  Def.'s Mot. Ex. 8 ("DiBerardinis Dep.") 77:23–79:13.

On January 4, 2016, the City appointed Nolan Atkinson as Chief Diversity and Inclusion Officer to lead the Office of Diversity and Inclusion.  Def.'s SUMF ¶ 140.  The Office of Diversity and Inclusion spent the first six-to-nine months of 2016 planning a City diversity initiative, which involved gathering information about the municipal workforce, updating job descriptions, and developing recruiting and hiring guides to use when interviewing candidates. *Id.* ¶ 142; Def.'s Mot. Ex. 38 ("Atkinson Dep.") 18:3–19:24.  The City contends that policies "in furtherance" of the diversity initiative did not begin until "approximately late 2016."  Def.'s Mot. 17.  Slusser testified that, around this time, the City implemented a policy that required all City departments "to publicly post their job descriptions, publicly commit to a diverse pool of candidates [and] commit to a diverse pool of interviewers."  Def.'s SUMF ¶ 144; Def.'s Mot. Ex. 39 ("Slusser Dep. II") 47:6–19.  Atkinson testified that he had no discussions with Mayor Kenney, Abernathy, or Slusser about the hiring of department heads prior to May 2016 and that he had no involvement in hiring Commissioner Carney.  Def.'s SUMF ¶ 148.

Plaintiff testified that he "think[s] there is . . .  a policy, since the Kenney Administration took office, to hire people based on race and gender."  Pl.'s SUMF ¶ 23; Tomaszewski Dep. 21:2–4.  Similarly, PDP Human Resources Manager Tracy Delaney, the Department's highest ranking Human Resources official, at one point testified[4] that she believed the City has had a policy of considering race in personnel decisions since the start of the Kenney Administration.

---

[4] The Court notes that the deposition of Delaney was taken in the course of separate litigation, *Pierce v. City of Philadelphia*, No. 17-cv-5539.

Pl.'s SUMF ¶¶ 20, 22; Def.'s Resp. Pl.'s Mot. Partial Summ. J. ("Def.'s Resp.") Ex. A
("Delaney Dep.") 40:3–41:20.  Significantly, she later clarified that when she testified about the
City's consideration of race in hiring, she was referring to the City's Workforce Diversity Profile
Report on the demographics of City personnel, not a City policy.  Delaney Dep. at 118:17–19.
She also testified that she had no knowledge that the PDP ever made hiring decisions based on
race and that City does not have a policy of considering race in hiring.  *Id.* at 115:8–11, 118:7–
13.  Most importantly, there was no evidence presented which links Delaney's testimony to
events before Mayor Kenney was sworn into office on January 4, 2016.

### D.      Plaintiff's EEOC Charge and Employment After Carney is Hired

Carney's appointment as Commissioner became effective on May 23, 2016.  Def.'s
SUMF ¶ 149.  Less than two months later, on July 5, 2016, plaintiff filed a charge with the Equal
Employment Opportunity Commission ("EEOC"), alleging race and gender discrimination based
on the City's decision not to promote him to Commissioner.  *Id.*; Def.'s Mot. Ex. 40.

Plaintiff testified that he told Commissioner Carney that he had filed the EEOC charge,
after which "there was a chilling of [his] relationship with Blanche [Carney]" and he began
experiencing perceived mistreatment by PDP leadership.  Def.'s SUMF ¶¶ 150, 158;
Tomaszewski Dep. 103:9–17.  In August 2016, Commissioner Carney ordered an audit of the
"locker fund," a PDP financial account managed by plaintiff in his capacity as Deputy
Commissioner.  Def.'s Resp. Pl.'s SUMF ¶ 103.  Commissioner Carney called for the audit after
the Office of Inspector General ("OIG") notified her about an anonymous tip that it had received
in July 2015 that plaintiff was mishandling the funds in the account.  *Id.*; Def.'s SUMF ¶ 155
n.8; Def. Ex. 6 ("Carney Dep.") 171:1–172:22.  After the audit, Greg Vrato, Commissioner
Carney's Chief of Staff, reported irregularities in the account back to the OIG for further

investigation.  Def.'s Mot. Ex. 4 ("Vrato Aff.") ¶ 5.  OIG opened an official investigation in

January 2017, which ultimately concluded that plaintiff had not mismanaged the funds.  Def.'s

SUMF ¶¶ 155 n.8, 157.

Plaintiff filed this employment discrimination lawsuit on October 19, 2017.

Commissioner Carney testified that she learned about the lawsuit in "late 2017 or early 2018."

Carney Dep. 177:14–24.

In late 2017 or early 2018, after another Deputy Commissioner took a medical leave of

absence, Commissioner Carney assigned plaintiff and the Deputy Commissioner of Operations

additional tasks and responsibilities.  Def.'s Resp. Pl.'s SUMF ¶¶ 112–13; Carney Dep. 263:6–

21.  At one point, plaintiff asked Commissioner Carney for assistance handling the new

assignments.  Def.'s Resp. Pl.'s SUMF ¶ 114.  In response, Commissioner Carney assigned

Vrato to provide support.  *Id.*  Plaintiff claims that Vrato did not provide the requested

assistance.  Pl.'s SUMF ¶ 114; Pl.'s Resp. Def.'s SUMF ¶ 171.

Between January 22, 2018 and March 26, 2018, Commissioner Carney issued at least six

supervisory memoranda to plaintiff regarding his personal performance and the performance of

units under his supervision.  Def.'s SUMF ¶ 159; Def.'s Mot. Ex. 42.  The memoranda

addressed, *inter alia*, plaintiff's purportedly improper handling of two correctional officers'

disciplinary hearings and unprofessional behavior and poor quality of work by some of

plaintiff's subordinates.  Def.'s Mot. Ex. 42.  Plaintiff testified that he was not penalized as a

result of the supervisory memoranda and he did not even know whether the memoranda were

placed in his personnel file.  Def.'s SUMF ¶ 163.

During this same approximate time period, between January 16, 2018 and February 22,

2018, plaintiff took a medical leave of absence due to anxiety and depression.  Pl.'s SUMF

¶ 115; Def.'s SUMF ¶ 168; Def.'s Mot. Ex. 44.  On January 22, 2018, Commissioner Carney directed plaintiff to provide documentation regarding his diagnosis, prognosis, and expected return date.  Def.'s Resp. Pl.'s SUMF ¶ 116.[5]  Plaintiff submitted some medical documentation from his physician, but on January 31, 2018, Delaney, the PDP Human Resources Manager, sent plaintiff a letter requesting additional documents supporting his need for leave.  *Id.* ¶ 118; Pl.'s Resp. Def.'s Mot. Summ. J.[6] ("Pl.'s Resp.") Ex. M.  On February 28, 2018, plaintiff sent updated medical information to Delaney about his diagnosis, and his request for medical leave was ultimately approved through February 22, 2018.  Def.'s SUMF ¶ 168; Pl.'s Resp. Ex. O.

Less than two months after returning from leave, on April 15, 2018, plaintiff informed Commissioner Carney that he planned to take another medical leave of absence for "an extended period of time."  Pl.'s SUMF ¶ 125; Pl.'s Resp. Ex. P; Def.'s SUMF ¶ 173.  In response, the next day Delaney requested that plaintiff provide an expected return date and prognosis from his physician.  Pl.'s Resp. Ex. Q.  Shortly thereafter, on April 22, 2018, plaintiff filed a second charge of discrimination with the EEOC.  Def.'s SUMF ¶ 174; Def.'s Mot. Ex. 44.  Plaintiff never returned to work and eventually retired from PDP on January 5, 2019.  Def.'s SUMF ¶ 175.

On March 13, 2018, plaintiff filed a First Amended Complaint (Document No. 10).  In the First Amended Complaint, plaintiff asserts claims of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I); 42 U.S.C. § 1981 (Count II); the Equal Protection Clause under 42 U.S.C. § 1983

---

[5] Plaintiff claims that PDP policies did not require that plaintiff disclose this more detailed information about his diagnosis and prognosis.  Pl.'s SUMF ¶ 119; Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") Ex. N.  In response, the City contends that Commissioner Carney believed that she requested this information in accordance with a PDP operational memorandum dated June 18, 2003 governing, *inter alia*, paid or unpaid leave for fifteen consecutive work days.  *See* Def.'s Mot. Ex. 43.
[6] Plaintiff erroneously titled this document "Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment."

(Count III); the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*

(Count IV); and the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code. § 9-1100 *et*

*seq.* (Count V).[7]

On August 19, 2019, plaintiff filed a motion for partial summary judgment with respect

to his claims of race and gender discrimination under Title VII (Document No. 35).  The same

day, the City filed a motion for summary judgment on all of plaintiff's claims (Document No.

36).  The motions are fully briefed and ripe for decision.

## III.   LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A fact is

material when it "might affect the outcome of the suit under the governing law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and

determine the truth of the matter but to determine whether . . . there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.  However,

the existence of a mere "scintilla" of evidence in support of the nonmoving party is insufficient.

*Id.* at 252.  In making this determination, "the court is required to examine the evidence of record

in the light most favorable to the party opposing summary judgment, and resolve all reasonable

inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (internal

---

[7] In the First Amended Complaint, plaintiff also asserted claims for hostile work environment, but withdrew those claims in his response to the City's motion for summary judgment. *See* Pl.'s Resp. 2 n.2.  Accordingly, the Court grants the City's motion for summary judgment with respect to plaintiff's hostile work environment claims by agreement.

citations omitted).  The party opposing summary judgment must, however, identify evidence that

supports each element on which it has the burden of proof.  *Celotex Corp.*, 477 U.S. at 322.

## IV.   DISCUSSION

Plaintiff asserts claims of (1) race and gender discrimination and (2) retaliation under

Title VII, the PHRA, the PFPO, 42 U.S.C. § 1981, and the Equal Protection Clause under 42

U.S.C. § 1983.  The Court concludes that there is no genuine dispute of material fact with respect

to any of plaintiff's claims and that the City is entitled to judgment on each claim.

### A.   Race and Gender Discrimination Claims

Plaintiff alleges that the City engaged in race and gender discrimination by failing to

promote him and later promoting Blanche Carney as Commissioner of Prisons.  A claim for race

and gender discrimination under Title VII, the PHRA, the PFPO,[8] § 1981, and § 1983 may be

asserted under both the familiar pretext theory of *McDonnell Douglas Corporation v. Green,* 411

U.S. 792 (1973) and the mixed-motive theory of *Price Waterhouse v. Hopkins,* 490 U.S. 228

(1989), *modified on other grounds by* the Civil Rights Act of 1991.[9]  *See Anderson v. Wachovia*

*Mortg. Corp.*, 621 F.3d 261, 268 (3d Cir. 2010); *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir.

2008).  At this stage of the litigation, plaintiff need not select which of the two theories to

pursue.  *See Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1098 (3d Cir. 1995)

(permitting an employee to present his case under both theories at trial, provided that the court

---

[8] Courts in the Third Circuit construe claims under the PHRA and the PFPO consistently with Title VII claims.  *See Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996) ("[T]he PHRA is applied in accordance with Title VII."); *Joseph v. Cont'l Airlines*, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000) (noting PFPO claims "are analyzed in the same manner" as Title VII claims).  Thus, the analysis of plaintiff's Title VII claims applies with equal force to his PHRA and PFPO claims.

[9] To prove liability under § 1983 and § 1981, plaintiff must also establish that his injuries were proximately caused by a municipal policy or custom.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *McGovern v. City of Phila.*, 554 F.3d 114, 121 (3d Cir. 2009) (extending *Monell* to cases arising under § 1981).  Because the Court concludes that plaintiff did not suffer intentional discrimination, the Court does not reach the question of whether plaintiff's injuries were caused by a municipal policy or custom.

"decide whether one or both theories properly apply" prior to instructing the jury). The Court thus addresses each theory in turn.

### 1.    Pretext Theory

Under the pretext theory, plaintiff must prove that race or gender was a determinative factor in the City's decision not to promote him using the three-prong *McDonnell Douglas* burden-shifting framework. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) ("To prevail at trial, the plaintiff must prove not that the illegitimate factor was the *sole* reason for the decision, but that the illegitimate factor was a *determinative* factor in the adverse employment decision."). Courts apply the same burden-shifting framework to discrimination claims asserted under Title VII, the PHRA, PFPO, § 1981, and § 1983. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (applying the *McDonnell Douglas* framework to Title VII, PHRA, and § 1981 claims); *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997) (applying *McDonnell Douglas* to discrimination claims asserted under § 1981 and § 1983).

Under the pretext theory, the plaintiff first bears the burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* This burden is one of production, not persuasion. *Burdine*, 450 U.S. at 255. If the employer offers a legitimate, nondiscriminatory explanation, in order to survive summary judgment, the plaintiff must then submit evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones v. Sch. Dist. of Phila.*, 198 F.3d at 410. Notwithstanding this burden-shifting framework, the plaintiff always bears the ultimate burden

of persuading the trier of fact that the employer intentionally discriminated against plaintiff. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 799 n.10 (3d Cir. 2003).

In this case, the City concedes that plaintiff has demonstrated a *prima facie* case of race and gender discrimination.  Def.'s Mot. 8.  In turn, the City advances a legitimate, non-discriminatory reason for not promoting plaintiff: namely, that the Public Safety Transition Committee did not recommend plaintiff for a second-round interview, which effectively terminated his candidacy several months before Carney even applied for the position.  Multiple members of the Committee testified that they had concerns about plaintiff's relatively limited experience in rehabilitation and reentry, his ability to bring a new vision to PDP, and the quality of his interview.  Def.'s SUMF ¶¶ 51–55.  Further, the record establishes that shortly after the Committee issued its recommendation not to advance plaintiff in the hiring process on December 10, 2015, Slusser, Abernathy, and other Kenney Administration officials determined that they would expand the search for a new Commissioner, given the lack of "clear strong candidates." Def.'s SUMF ¶¶ 49–50, 65; Def.'s Mot. Exs. 25, 27.  This explanation meets the City's "relatively light burden" of production under *McDonnell Douglas*.  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes*, 32 F.3d at 759).

Based on such evidence, the burden shifts to plaintiff to show that the City's explanation is pretextual.  To show pretext, plaintiff must identify "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; *see also id.* at 765 ("[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'")
(internal citation omitted).  The Court concludes that there is insufficient record evidence that the
City's proffered reasons for removing plaintiff from consideration for the Commissioner position
are pretextual.

Plaintiff argues that the City has a policy of considering race in hiring decisions and a
"stated interest" in appointing women, both of which establish pretext.  *See* Pl.'s Resp. 4.  The
Court rejects this argument.  Plaintiff has produced no evidence connecting the City's diversity
initiative, or any purported racial or gender preferences, to the Public Safety Transition
Committee's recommendation not to hire plaintiff and the Kenney Administration's adoption of
the Committee's recommendation in December 2015.  This evidentiary gap is fatal to plaintiff's
discrimination claims.  *See Musa v. Soar Corp.*, No. CIV.A. 13-2847, 2014 WL 6809019, at *7
(E.D. Pa. Dec. 1, 2014) ("Unless a plaintiff can demonstrate that a defendant employer's
'approach to diversity had some negative impact upon his individual employment situation, the
mere existence of a policy promoting diversity awareness is not evidence of discrimination'
under Title VII.") (quoting *Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 185 (D. Del.
2001)); *Opsatnik v. Norfolk S. Corp.*, No. CIV.A. 06-81, 2008 WL 763745, at *11 (W.D. Pa.
Mar. 20, 2008), *aff'd*, 335 F. App'x 220 (3d Cir. 2009) ("[T]o use diversity concerns, without
more, as evidence of discrimination would be irresponsible.").

Plaintiff's evidence of pretext may be separated into three categories: (1) the City's
diversity goals, diversity initiative, and hiring policies; (2) the Public Safety Transition
Committee's consideration of plaintiff's application and recommendation not to advance him in
the hiring process; and (3) the recommendation and selection of Blanche Carney as
Commissioner.  The Court addresses each category of evidence in turn.

15

First, plaintiff has produced no evidence that the City's diversity initiative—which he argues "establishe[s] . . . a [discriminatory] animus"—existed during the brief time he was under consideration for the Commissioner position.  Pl.'s Resp. 7.  In support of his position, plaintiff cites *Pierce v. City of Philadelphia*, No. 17-cv-5539, 2018 WL 6832093 (E.D. Pa. Dec. 28, 2018), a case involving PDP's failure to promote a Native American woman in July 2016, after the selection of Commissioner Carney in April 2016.  The facts presented in *Pierce* are completely unrelated to the process for hiring the new Commissioner in place in December of 2015, and, specifically, the Committee's review of plaintiff's application.  In short, *Pierce* is too remote in point of time to be of any evidentiary value with respect to plaintiff's discrimination claims against the City for removing him from the hiring process in December 2015.

To further support his argument, plaintiff selectively cites testimony by Human Resources Manager Delaney from the *Pierce* litigation and Managing Director DiBerardinis as evidence of discriminatory motive.  Plaintiff's reliance on Delaney's testimony is flawed because Delaney later clarified in her deposition that when she testified about the City's consideration of race in personnel decisions, she was referring to the City's Workforce Diversity Profile Report, not a City policy.  Delaney Dep. 115:8–11; 118:7–13.  She further testified that she had no knowledge of a City policy that considered race in hiring decisions, or of an instance in which the PDP made a hiring decision based on race.  *Id.* at 115:8–11, 118:7–13.  Significantly, Delaney at no point testified about the City's hiring practices before Mayor Kenney was inaugurated on January 4, 2016—the relevant time period for this case—or the process for appointing a new Commissioner.  DiBerardinis's general statement that he "understood it as a priority" of Mayor Kenney to appoint women to senior City positions also was not linked to the Committee's recommendation not to offer plaintiff a second-round interview, temporally or in

16

any other way.  DiBerardinis Dep. 77:23–79:13.

In addition, plaintiff proffers his own conclusory testimony that he "think[s] there is . . . a policy, since the Kenney Administration took office, to hire people based on race and gender." Pl.'s SUMF ¶ 23; Tomaszewski Dep. 21:2–4.  Such a bare assertion fails to create a genuine dispute of material fact regarding the City's reasons for not promoting him.  *See Habib v. Urban Outfitters, Inc.,* No. 03–CV–1561, 2004 WL 765119, at *6 (E.D. Pa. Apr. 1, 2004) ("A plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination."); *King v. Sch. Dist. of Phila.,* No. 00–CV–2503, 2001 WL 856948, at *4 (E.D. Pa. July 26, 2001) ("Plaintiff's [c]onclusory and unsupported beliefs are insufficient to create a genuine issue of material fact as to [a] Defendant['s] motivation or [to] support an inference of discrimination based on race.").

Second, plaintiff has produced no evidence that the Committee considered candidates' race or gender, or that the Kenney Administration considered race or gender when it decided to adopt the Committee's recommendation.  Plaintiff has offered no evidence that Committee members were aware of Mayor Kenney's diversity priorities or that the Committee was asked to more seriously consider minority applicants.  To the contrary, two members of the Committee testified that they did not receive direction to consider race or gender and that they did not discuss the race or gender of the applicants.  Def.'s SUMF ¶ 59 n.3.  The record further shows that, after receiving the Committee's recommendations, Administration officials promptly concluded that there were "no clear strong candidates," without any discussion of the applicants' race or gender.  Def.'s SUMF ¶¶ 49–50, 65; Def.'s Mot. Exs. 25, 27.

The only record evidence regarding possible racial or gender bias in the Committee's deliberations is plaintiff's testimony that he believed Minister Muhammad—a member of the

Committee—and the NAACP pressured the City to appoint an African American female Commissioner, and that he "believe[d] [Muhammad is] the one that made the suggestion that the Commissioner of Prisons would be a black female." Def.'s SUMF ¶¶ 58–59; Pl.'s Resp. Def.'s SUMF ¶¶ 58–59; Tomaszewski Dep. 79:24–80:22, 27:20–28:16. These contentions are based on unsubstantiated statements allegedly made to plaintiff by two individuals: Michael Resnick and Lorenzo North. Tomaszewski Dep. 19:4–10.

According to plaintiff, Resnick told him about these alleged efforts by Muhammad and the NAACP during an April 2016 conversation, approximately five months after plaintiff was removed from consideration for the Commissioner position. Tomaszewski Dep. 19:4–10; 79:24– 80:22. However, Resnick testified that he had no independent knowledge of the alleged April 2016 conversation with plaintiff and that "independently I don't know that that's what the NAACP did or wanted" or "that's where the pressure came from." Resnick Dep. 107:12–109:9. Further, Resnick stated that "I probably just relayed to [plaintiff] things that I heard" from North, the president of the correctional officers union, but "can't be sure." *Id.* at 108:22–109:9.[10] Plaintiff also testified that, on an unspecified date, North told him that "the City was looking to hire a black female for Prisons Commissioner," but plaintiff had no independent knowledge of the basis for North's statement. *Id.* 19:4–10, 56:1–3. Muhammad testified that he never communicated to the City about hiring an African American female Commissioner. Muhammad Dep. 56:8–20. Significantly, the record does not include a deposition from North.

Plaintiff's testimony about Muhammad and the NAACP—based on unsupported statements by North and Resnick—is insufficient to meet his burden in this case. The oral

---

[10] When asked whether he knew the basis for Resnick's statements, plaintiff testified that he "believe[d] [Resnick] had been told by Mr. North, the head of [the] [c]orrection[al] [o]fficer union, and I don't know where else he may have got it." Tomaszewski Dep. 55:22–24.

statements allegedly made by North and Resnick to plaintiff are inadmissible hearsay.  *See* Fed. R. Evid. 801(c); Fed. R. Evid. 802 ("Unless a federal statute, the Federal Rules of Evidence, or a rule prescribed by the Supreme Court prescribes otherwise, hearsay is not admissible."). "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."  *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).  However, if a proponent can show that the hearsay statement is capable of being presented in an admissible form—for example, by calling the hearsay declarant to testify at trial—the Court may consider the statement in ruling on a motion for summary judgment.  *See, e.g.*, *Palfrey v. Jefferson-Morgan Sch. Dist.*, 355 F. App'x 590, 593 n.1 (3d Cir. 2009); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1235 n.9 (3d Cir. 1993)*.

In this case, the Court does not consider plaintiff's testimony about North's alleged statements about Muhammad, the NAACP, and the City's alleged search for an African American female Commissioner because such statements are hearsay that cannot be presented in an admissible form.  Given plaintiff's failure to depose North, the Court concludes that he has not shown that North can present evidence of discriminatory motive through direct testimony.  *See Williams v. Pennridge Sch. Dist.,* No. CV 15-4163, 2018 WL 6413314, at *11 n.5 (E.D. Pa. Dec. 6, 2018) ("[T]he mere possibility that [a] hearsay statement will be presented in [the] form of admissible evidence at trial does not warrant consideration of hearsay evidence at [the] summary judgment stage.") (internal citation and quotation marks omitted); 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.91 (2020) ("Depending on the circumstances, the failure to secure sworn statements at the summary-judgment stage—or to confirm that the witnesses can and will testify as expected later—can significantly undercut the claim that the statements actually can be presented in an admissible form at trial.").

With respect to Resnick, the record shows that he lacks personal knowledge regarding any alleged communications between Muhammad, the NAACP, and the City in connection with the selection of the new Commissioner.  Resnick Dep. 107:12–109:9.  Specifically, Resnick admitted that any remarks he made to plaintiff about Muhammad and the NAACP were based on statements relayed to him by North.  *Id.*  Thus, any testimony by Resnick on these matters would be based on inadmissible hearsay.  *See Palfrey v. Jefferson-Morgan Sch. Dist.*, 355 F. App'x, 590, 593 n.1 (3d Cir. 2009) (refusing to consider hearsay statements by declarant who was "not in a position to corroborate [plaintiff's] deposition testimony"); *Deitrick v. Costa*, No. 4:06-CV-01556, 2015 WL 1605700, at *22 (M.D. Pa. Apr. 9, 2015) (refusing to consider hearsay statements that were, *inter alia*, "not capable of admission as testimony based on personal knowledge").

Even assuming that plaintiff's testimony about what Resnick told him were admissible, such testimony cannot support an inference that discriminatory animus caused the City's failure to promote plaintiff.  Resnick's alleged statements to plaintiff in April 2016 are too remote in point of time from the decision not to advance plaintiff in the hiring process in December 2015 to demonstrate discriminatory motive.  *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999) (holding that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision") (internal citation and quotation marks omitted).  Although he was the most senior official in the PDP at the time, Resnick's comments bore no direct relationship to the Committee's decision not to recommend plaintiff for promotion to Commissioner.  What remains of plaintiff's testimony about Muhammad and the NAACP is mere speculation that does not defeat a motion for summary judgment.  *See Ramara, Inc. v.*

*Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) ("[T]he non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment.").

Third, plaintiff argues that subsequent events in the hiring process after his elimination and the eventual selection of Commissioner Carney demonstrate pretext. Specifically, plaintiff contends that Resnick's recommendation of Carney on March 7, 2016 and Abernathy's subsequent message to Slusser—both of which expressly referenced Carney's race—show that the City's non-discriminatory explanations are pretextual reasons for its decision not to promote him in December 2015. In addition, plaintiff claims that Mayor Kenney's statement on April 12, 2016 that he was "very excited it was a woman we finally picked" for the Commissioner position would cause a reasonable jury to disbelieve the City's non-discriminatory explanation for not hiring plaintiff, a Caucasian male. Def.'s SUMF ¶ 127; Def.'s Mot. Ex. 37.

The Court rejects plaintiff's argument that the events immediately before and after the selection of Commissioner Carney in April 2016 establish pretext. A key issue in this case is the significant delay between the elimination of plaintiff from consideration for the Commissioner position in early December 2015 and the announcement of Carney's selection on April 12, 2016. As with Resnick's alleged statements to plaintiff in April 2016, discussed *supra*, Resnick's March 2016 comments to Abernathy about Carney are too attenuated from the decision not to hire plaintiff. Significantly, when he recommended Carney, Resnick was merely another candidate for the Commissioner position, not a decision-maker. As such, his remarks are insufficient to establish pretext. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). Moreover, the message by Abernathy and statement by Mayor Kenney are too temporally remote from plaintiff's removal from the hiring process to create a genuine dispute of material fact regarding pretext. *See Eason v. Del Monto Foods*, No. CIV.A.04-1698,

21

2006 WL 2645146, at *6 (W.D. Pa. Sept. 14, 2006) ("[E]ven if a plaintiff's evidence 'permits a tenuous inference of pretext and, by extension, discrimination,' the evidence may 'be insufficient as a matter of law to support a finding of discrimination.'") (internal citation omitted).

The record is devoid of any evidence connecting the City's diversity initiative or the hiring of Blanche Carney in April of 2016 to the decision-making regarding plaintiff's candidacy.  As a result, even considered together under the totality of the circumstances, the above-discussed evidence is insufficient to permit a factfinder to infer that the City's non-discriminatory explanation is either "a *post hoc* fabrication" or that race or gender more likely than not motivated plaintiff's non-selection.  *See Fuentes,* 32 F.3d at 762, 765; *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 516 (E.D. Pa. 2010) (DuBois, J.).  Plaintiff's claims of race and gender discrimination thus fail under the pretext theory.

### 2.   *Mixed-Motive Theory*

Plaintiff's race and gender discrimination claims also fail under the mixed-motive theory. In a mixed-motive discrimination case, "both legitimate and illegitimate reasons motivated" the employment decision.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93 (2003).  Unlike in the pretext context, the Third Circuit applies two different legal standards to mixed-motive claims under (1) Title VII, the PHRA, and PFPO and (2) § 1981 and § 1983.  *See id.* at 99; *Anderson*, 621 F.3d at 269.  In mixed-motive cases under Title VII, the PHRA, and PFPO, the plaintiff must demonstrate, using either direct or circumstantial evidence, that race or gender was a motivating factor in the defendant's employment decision*.  See Desert Palace*, 539 U.S. at 99–101; *Makky*, 541 F.3d at 214.  By contrast, in mixed-motive cases under § 1981 and § 1983, the plaintiff must

produce only direct evidence[11] that race or gender was a motivating factor in the defendant's employment decision.  *See Anderson*, 621 F.3d at 267–68; *Pierce*, 2018 WL 6832093, at *9.

Plaintiff moves for partial summary judgment on his Title VII race and gender discrimination claim under the mixed-motive theory.  Under Title VII, once the plaintiff shows that race or gender was a motivating factor in the defendant's employment action, the burden shifts to the defendant to show that it "would have taken the same action in the absence of the impermissible motivating factor."  42 U.S.C. § 2000e-5(g)(2)(B); *see also Watson v. SEPTA*, 207 F.3d 207, 218 (3d Cir. 2000).  This "limited affirmative defense . . . does not absolve [the defendant] of liability, but restricts the remedies available to a plaintiff" to declaratory relief, injunctive relief, and attorney's fees and costs.  *Desert Palace*, 539 U.S. at 94; *see also* 42 U.S.C. § 2000e-5(g)(2)(B)(i)–(ii) (providing, *inter alia*, that the Court "shall not award damages or issue an order requiring . . . promotion [of plaintiff]").

Plaintiff contends that he has met his initial burden under the mixed-motive framework and that the burden thus shifts to the City to assert a limited affirmative defense at trial.  Pl.'s Mot. Partial Summ. J. 9–10.  The Court disagrees.  Significantly, plaintiff has not presented any direct or circumstantial evidence that would allow a reasonable jury to conclude, by a preponderance of the evidence, that race or gender was a motivating factor in the City's decision not to promote him to Commissioner.  As discussed in Part IV.A.1, *supra*, the record contains no

---

[11] The Third Circuit has held that "direct evidence" must satisfy two requirements:

> First, the evidence must be strong enough "to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision."  Second, the evidence must be connected to the decision being challenged by the plaintiff.  Specifically, any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision.  We have referred to these requirements as creating a "high hurdle" for plaintiffs.

*Anderson*, 621 F.3d at 269 (3d Cir. 2010) (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513–16 (3d Cir. 1997).

evidence that the Public Safety Transition Committee considered plaintiff's race or gender before issuing its recommendation regarding his candidacy or that any City official considered his race or gender in accepting the Committee's recommendation.  Accordingly, plaintiff has not met his initial burden of proving race or gender discrimination under the mixed-motive theory, and those claims fail.

### B.    Retaliation Claims

Plaintiff alleges that the City engaged in retaliatory conduct against him after filing his first EEOC charge and this discrimination lawsuit.  Plaintiff's retaliation claims are also governed by the *McDonnell Douglas* burden-shifting framework.  *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).  To establish a *prima facie* case of retaliation in violation of Title VII, the PHRA, PFPO, and § 1981, plaintiff must show that (1) he engaged in protected activity, (2) the City took an adverse employment action against him during or after the protected activity and (3) there was a causal link between the protected activity and the adverse employment action.  *See Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006); *Pierce*, 2018 WL 6832093, at *13.

Of the three elements, it is undisputed that plaintiff engaged in protected activity when he filed his first EEOC charge on July 5, 2016 and this lawsuit on October 19, 2017.  *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 301 (3d Cir. 2007), *as amended* (Aug. 28, 2007); *Medero v. NBC Merchants, Inc.*, No. CV 16-6583, 2017 WL 3328361, at *5 (E.D. Pa. Aug. 3, 2017).  This leaves only the second and third elements in dispute.

In order to satisfy the second element of a *prima facie* retaliation claim, which requires an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have

24

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted).  In evaluating the "material adversity" requirement, "it is important to separate significant from trivial harms" because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.*

The third element of a *prima facie* retaliation claim requires that plaintiff show his "protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  To establish the requisite causal connection, a plaintiff usually must prove either (1) an "unusually suggestive" temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997); *Woodson*, 109 F.3d at 920–21.  In the absence of that proof, the plaintiff must show that, from the "evidence gleaned from the record as a whole," the trier of fact should infer causation.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

In this case, plaintiff alleges that Commissioner Carney and the City retaliated against him by (1) auditing and investigating the "locker fund" that he managed; (2) requesting medical documentation in connection with his medical leave requests; (3) issuing supervisory memoranda critical of his work performance; and (4) assigning him additional work responsibilities.  The Court addresses each claim in turn, concluding that plaintiff has not satisfied the second or third elements of a *prima facie* retaliation claim—adverse employment action and causation—with respect to any of the alleged forms of retaliation.

25

### 1. Audit and OIG Investigation of the "Locker Fund"

Plaintiff contends that the audit of the "locker fund" and Commissioner Carney's referral of the matter to OIG were retaliatory responses to his EEOC charge.  With respect to the first element, reporting an employee for internal investigation is not alone an adverse employment action.  *See, e.g.*, *Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 505 (M.D. Pa. 2014), *aff'd*, 612 F. App'x 124 (3d Cir. 2015) ("[A] mere investigation is not an adverse employment [action]."); *Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 53 (D.D.C. 2007) ("The mere initiation of an investigation into a plaintiff's conduct is not an adverse employment action when it has no effect on the plaintiff's employment.").  The Court notes that such a referral may constitute a materially adverse action when the investigation leads to discipline or causes "disruption and embarrassment" to the employee.  *Harley v. Geithner*, No. CIV. 07-3559 JBS/JS, 2010 WL 3906642, at *15 (D.N.J. Sept. 29, 2010), *aff'd sub nom. Harley v. U.S. Sec'y of Treasury*, 444 F. App'x 594 (3d Cir. 2011).  The record in this case contains no evidence of such adverse consequences for plaintiff following the PDP's investigation into the "locker fund."  To the contrary, the OIG investigation revealed that plaintiff had not mismanaged the account.  Def.'s SUMF ¶¶ 155 n.8, 157.  Thus, the Court concludes that the audit and OIG investigation do not amount to an adverse employment action required for a *prima facie* case of retaliation.

Moreover, plaintiff has not demonstrated a causal connection between his protected activity and the audit and OIG investigation.  The record shows that the OIG received an anonymous letter regarding possible mismanagement of the "locker fund" in July 2015, approximately a year before plaintiff filed his first EEOC charge on July 5, 2016, and that the OIG investigation was officially opened in January 2017, approximately five months after

plaintiff filed his EEOC charge.  Def.'s SUMF ¶ 155 n.8.  Such timing demonstrates that the City

did not order the audit and investigation in response to plaintiff's protected activity.  The Court

therefore concludes that plaintiff's retaliation claims based on the audit and OIG investigation of

the "locker fund" fail.

2. <em>Requests for Medical Documentation</em>

Plaintiff claims that Commissioner Carney requested confidential medical information

from him in retaliation for his protected activity.  First, the Court concludes that the City's

requests for additional documentation regarding his medical leave do not rise to the level of a

materially adverse employment action.  *See, e.g.*, *Moore v. Napolitano*, No. CIV.A.07-2666,

2010 WL 2671850, at *7 (E.D. La. June 29, 2010) ("[I]n most cases, a reasonably necessary

request for medical information is not considered a materially adverse employment action.");

*Browne v. City Univ. of New York,* 419 F. Supp. 2d 315, 335 (E.D.N.Y. 2005) (finding that

defendant's "requirement that [plaintiff] submit additional medical documentation for an

extension of disability leave" does not qualify as materially adverse).  The record in this case

shows that the PDP, through Commissioner Carney and Human Resources Manager Delaney,

merely requested routine medical information from the date plaintiff's leave started on a

biweekly basis until his return to work.  Pl.'s Resp. Exs. K, M.  Delaney requested more detailed

information regarding plaintiff's diagnosis only after he provided inadequate documentation.

Def.'s Resp. Pl.'s SUMF ¶ 118; Pl.'s Resp. Ex. M.  In total, plaintiff received only three requests

for medical information related to his two requests for medical leave, both of which were

ultimately granted.  Def.'s Resp. Pl.'s SUMF ¶¶ 115–16, 118; Def.'s SUMF ¶ 168; Pl.'s Resp.

Ex. Q.  Although the parties dispute whether Commissioner Carney needed such information

under PDP policies, such routine requests hardly approach the "materially adverse" standard for

27

a retaliation claim.

Assuming *arguendo* that the requests for medical documentation constitute a materially adverse action, a reasonable jury could not infer that the requests were causally connected to his protected activity.  The requests—made on January 22, 2018, January 31, 2018, and April 16, 2018—were each sent more than sixteen months after plaintiff's EEOC charge was filed on July 5, 2016 and more than three months after this lawsuit was filed on October 19, 2017.  Def.'s Resp. Pl.'s SUMF ¶¶ 116, 118; Pl.'s Resp. Ex. Q.  Such an extended lapse of time is not "unusually suggestive" of a retaliatory motive.  *See, e.g.*, *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 136 (3d Cir. 2014) (finding that a three-month period is not "unusually suggestive" of retaliatory animus); *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014) (noting that "a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive").  As additional evidence of animus during this period, plaintiff cites his observation that "there was a chilling of [his] relationship with Blanche [Carney]," and the three other forms of allegedly retaliatory conduct that he experienced.  Def.'s SUMF ¶¶ 150, 159; *see* Pl.'s Resp. 27.  Such evidence is insufficient to show a pattern of ongoing antagonism necessary to establish causal connection in this case.  The Court thus concludes that plaintiff's retaliation claims regarding the medical information requests fail.

### 3.    *Supervisory Memoranda*

Plaintiff contends that the supervisory memoranda issued by Commissioner Carney were unfairly critical and motivated by retaliatory animus.  With respect to the "material adversity" standard, multiple courts in the Third Circuit have held that "a partially or wholly negative performance review is not materially adverse, for purposes of a retaliation claim, when unaccompanied by additional adverse impact on the plaintiff's employment."  *Johnson v. Indep.*

28

*Blue Cross*, No. CIV.A. 09-4239, 2013 WL 1874954, at *14 (E.D. Pa. May 3, 2013) (collecting

cases).  Plaintiff in this case fails to produce evidence that the memoranda represented official

disciplinary action by Commissioner Carney.  Def.'s SUMF ¶ 163; Pl.'s Resp. Def.'s SUMF

¶ 163.  Critically, plaintiff has failed to show that the memoranda carried any additional

consequences, such as reduction in title, pay, or promotional opportunities, or that the

memoranda were even placed in his personnel file.  Def.'s SUMF ¶ 163.  The Court thus

concludes that the memoranda would not dissuade a reasonable person from making or

supporting a charge of discrimination.  *See Morrison v. Carpenter Technology Corp.*, 193 F.

App'x 148, 154 (3d Cir. 2006) (holding that a "corrective performance review" was not

materially adverse on the ground that plaintiff failed to identify any resulting "harm or injury").

As a result, the memoranda do not constitute an adverse employment action supporting

plaintiff's retaliation claim.

        In addition, there is insufficient record evidence to permit a reasonable jury to infer that

the critical performance reviews were causally linked to plaintiff's protected activity.  The

memoranda were written between January 22, 2018 and March 26, 2018.  Def.'s SUMF ¶ 159;

*see* Def.'s Mot. Ex. 42.  As with the requests for medical documentation, the lapses in time

between the memoranda and plaintiff's protected activities on July 5, 2016 and October 19, 2017

are too long to suggest retaliatory motive by the City.  *See, e.g.*, *Williams v. Phila. Hous. Auth.*

*Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2007) (two months is not unusually suggestive).

Because plaintiff has not provided sufficient additional evidence of retaliatory animus, the Court

thus concludes that the retaliation claims regarding the supervisory memoranda fail.

### 4.    *Additional Work Assignments*

        Plaintiff's retaliation claims in connection with his additional work assignments also fail.

Plaintiff contends that Commissioner Carney retaliated against him by assigning him more responsibilities and not offering adequate support to handle the increased workload.  Courts have recognized that "'assignments outside [one]'s job description could constitute an adverse action.'"  *Riley v. Del. River & Bay Auth.*, 661 F. Supp. 2d 456, 466 n.62 (D. Del. 2009) (quoting *Murdick v. Catalina Mktg. Corp.*, 496 F. Supp. 2d 1337, 1355 (M.D. Fla. 2007)).  However, plaintiff provides no detail about the quantity or nature of the new work, other than to claim that the work was not reassigned evenly and that he did not receive assistance for his extra duties after requesting it.  Pl.'s SUMF ¶ 114; Pl.'s Resp. Ex. A ¶¶ 7–10.  The Court therefore concludes that plaintiff has failed to produce sufficient evidence that his workload was increased to the point that it constituted an adverse action.

Moreover, the record lacks sufficient evidence that could establish a causal connection between the additional work assignments and plaintiff's protected activity.  Commissioner Carney assigned plaintiff new responsibilities in late 2017 or early 2018, after another Deputy Commissioner took a leave of absence.  Def.'s Resp. Pl.'s SUMF ¶¶ 112–13; Carney Dep. 263:6–21.  Such timing is not "unusually suggestive" of retaliatory motive and, as discussed *supra*, plaintiff proffers insufficient additional evidence of antagonism to establish a causal connection.  The Court thus grants summary judgment in favor of the City with respect to plaintiff's retaliation claims based on his additional work assignments.

## V.   CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is denied and the City's motion for summary judgment is granted with respect to all of plaintiff's claims.  Judgment is entered in favor of defendant, the City of Philadelphia, and against plaintiff, Robert Tomaszewski.  An appropriate order follows.